**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert M Frotten, | No. CV-16-03289-PHX-DGC |
| Plaintiff, | **AMENDED ORDER** |
| v. | |
| INT Technologies LLC, | |
| Defendant. | |

Plaintiff Robert Frotten filed a complaint against Defendant INT Technologies, LLC ("INT") for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"). Doc. 18. INT moves for summary judgment on all claims (Doc. 67), and Plaintiff moves for partial summary judgment on INT's *Faragher/Ellerth* affirmative defense (Doc. 69). The motions are fully briefed, and no party requests oral argument. For the reasons that follow, the Court will deny both motions.

## I.    Background.

The Court will begin by providing a fairly detailed description of the factual matters at issue in this case. Because the case includes allegations of a sexually hostile work environment, the description includes some unsavory information.

Plaintiff worked as a technical recruiter at INT from July 2015 to April 2016. Doc. 68 at 2 ¶ 3, 4 ¶ 18; Doc. 71 at 3 ¶¶ 3, 18. INT is a staffing firm, and Plaintiff's

position required him to recruit and place qualified candidates with INT's clients for their information technology needs. Doc. 68-1 at 5 ¶¶ 4, 6. In addition to an annual salary of $50,000, Plaintiff earned commissions for placing professionals. *Id.* at 17. His "offer of employment" letter also entitled Plaintiff to "a non-recoverable draw against commissions . . . of $692.31 paid biweekly for a period of 4 months from start date with a possibility of a 2 month extension for good performance." *Id.*

INT is owned by Chris Knott (*id.* at 170), and a six-person leadership team advises Mr. Knott on many business matters, including whether to continue a recruiter's draw (Doc. 73-3 at 10, 17-18). The leadership team includes Rhonda Rutledge, Vice President and Director of Technical Recruiting; James Moloney, Vice President of Sales; Tamara Ellestad, Vice President of Recruiting; Richard Krause, Vice President of Operations; and Chris Moulton, Human Resource Manager. Doc. 73-4 at 4; Doc. 78-7 at 2. During Plaintiff's employment with INT, Mr. Moloney and Ms. Ellestad were married.[1] Doc. 68 at 2 ¶ 4; Doc. 71 at ¶ 4; Doc. 73 at 2 ¶ 5; Doc 73-3 at 5.

In July 2015, Plaintiff attended a training session in Arizona at which employees were required to participate in an icebreaker game prepared and organized by Ms. Moulton and Mr. Krause. Doc. 73-1 at 42-43; Doc. 73-4 at 7-8; Doc. 73-6 at 15-20. As part of the game, each employee had to email a "secret" about themselves, and Mr. Krause distributed the list of secrets during the icebreaker. Doc. 73-6 at 15-17. Employees then had to guess which employee submitted which secret. *Id.* One employee submitted a secret stating "I had sex in a convent," and the other employees, including Plaintiff, had to ask each other at the meeting if they had sex in the convent. Doc. 73-1 at 42-43; Doc. 73-6 at 15-17. Mr. Knott, Mr. Moloney, and Ms. Ellestad were present at the ice-breaker game, and one witness testified that they laughed at this "sex in a convent" entry. Doc. 73-6 at 19. Plaintiff and other employees found the entry inappropriate. Doc. 73-4 at 8; Doc. 73-6 at 18.

---

[1] Mr. Moloney and Ms. Ellestad have since divorced, but prior to the divorce, Ms. Ellestad was known as Tamara Moloney. Doc. 68 at 2 ¶ 4; Doc. 71 at ¶ 4; Doc. 73 at 2 ¶ 5; Doc 73-3 at 5.

At the mandatory dinner following the training session, Plaintiff joined a conversation with Mr. Moloney, Ms. Ellestad, and other INT employees. Doc. 71-1 at 26-27. During the conversation, Mr. Moloney told the group that he wanted to get "a hand job from a midget" because "his dick [would] look huge" in the midget's "little hands." Doc. 68-1 at 236; Doc. 71-1 at 26-27. Ms. Ellestad stated that she "was okay with him sleeping with a midget because it was only half a person." Doc. 68-1 at 236; Doc. 71-1 at 26-27. Plaintiff stated that Ms. Ellestad and Mr. Moloney then proceeded to banter back and forth about midget sex. Doc. 71-1 at 26-27. After these remarks, Plaintiff recounted how he once placed an advertisement on Craigslist seeking to hire a midget dressed as a leprechaun to accompany him to a Saint Patrick's Day parade. *Id.* at 28. Plaintiff testified that he did not find Mr. Moloney's comments offensive or sexually harassing, just "inappropriate" and "weird." Doc. 71-1 at 30. Ms. Ellestad, however, testified that Plaintiff made the remarks about having sex with a midget. Doc. 73-4 at 16-18. Another employee present for this conversation, Chris Baker, testified that Mr. Moloney and Ms. Ellestad made the remarks. Doc. 73-5 at 8-11. Mr. Baker also testified that Mr. Moloney, Ms. Ellestad, and Plaintiff laughed during this conversation. *Id.* at 11.

Following the July 2015 training, Plaintiff – like most of INT's recruiters – worked virtually from his home in South Carolina, and reported to Ms. Ellestad, who resided in Colorado. Doc. 68-1 at 5 ¶ 6. Although he worked remotely, Plaintiff participated in weekly conference calls with INT management, sales managers, and recruiters. Doc. 68-1 at 89; Doc. 71-6 at 10, 12. Plaintiff testified that these conference calls were replete with "sexually driven" and "offensive" comments, often made by INT's leadership team and in the presence of Mr. Knott. Doc. 71-1 at 25. For instance, during one of these conference calls, Plaintiff testified that a male employee, Caesar Pena, stated "I'm the third going down," implying that he was the third to present during the conference call. Doc. 68-1 at 89-90. In response, Mr. Moloney stated, "that's not what Rene said." *Id.* at 90. Mr. Knott then commented, "I told James [Moloney] not to

- 3 -

start drinking this early in the day." *Id.* Rene was a male employee at INT, and Plaintiff interpreted Mr. Moloney's response as implying oral sex between two male employees. *Id.* at 90, 237; Doc. 73-6 at 31-32. He testified that he was not offended by the comment, but "more in shock" that a senior leader would say that. Doc. 68-1 at 91.

Other employees aver that inappropriate sexual banter by INT's leadership team was commonplace on company conference calls and occurred often in the presence of Mr. Knott. Doc. 73-2 at 2-3 ¶¶ 2-3; Doc. 71-6 at 7-12. For instance, one recruiter, Katherine Noto, testified that before Mr. Moloney would make a "crass" comment – whether "sexual or about drugs" – he would ask if Ms. Moulton, INT's Human Resource Manager, was on the call. Doc. 71-6 at 9-11. Because employees had to say their names when they dialed into the conference call, Ms. Noto testified that Mr. Moloney knew Ms. Moulton was not on the call and thus was joking before he knowingly made an inappropriate remark. *Id.* at 10. She said that crass remarks occurred on "most of the calls." *Id.* at 13.

In early October 2015, after four months with INT, Ms. Ellestad evaluated Plaintiff's work performance. Doc. 73-4 at 9. She gave him a positive review, writing that "[i]f [Plaintiff] continues to produce on the front end like he is, I have no doubt that he will meet or exceed goals set out for him. Keep up the great work[.]" *Id.* at 10. Ms. Ellestad identified nothing negative about Plaintiff's performance and attitude. *Id.*

On October 26, 2015, Plaintiff emailed Mr. Knott, Ms. Ellestad, and Mr. Moloney about a meeting he attended at the Veteran Employment Summit on behalf of INT. Doc. 68-1 at 239. In his email, Plaintiff stated that one of the attendees was married to a military veteran. *Id.* Mr. Knott just replied: "So this guy wants to get credit for f--king a veteran? Veteran f--ker!." *Id.* Plaintiff – a veteran himself – testified he was offended and "blown away" by these remarks.[2] *Id.*

---

[2] Plaintiff also testified that Ms. Ellestad responding "Ha" to Mr. Knott's comments. Doc. 68-1 at 37. Although the record includes Mr. Knott's reply to Plaintiff's email (Doc. 68-1 at 239), Ms. Ellestad's alleged email response is not in the record.

- 4 -

On December 16, 2015, Plaintiff spoke on the phone for twenty-five minutes with Courtney Knott, who is an INT manager and the daughter of Mr. Knott. Doc. 68-1 at 94-97; Doc. 73-3 at 19-20. Plaintiff contacted Courtney for an "off the record" discussion of how to raise his and other recruiters' concerns with her father. Doc. 68-1 at 94-96. He testified that he said his problems "were with the Moloneys" and that he was "going to call her father's baby ugly." *Id.* at 96. By "baby," he meant INT, which Mr. Knott founded. *Id.* Plaintiff admitted, however, that he provided Courtney with only "very generic examples" of the problems he had with Mr. Moloney and Ms. Ellestad. *Id.* He did not mention they were related to "sexual . . . discrimination and the hostile work environment [at INT]." *Id.* at 97. He testified that that Courtney had "heard a lot of this" because her boyfriend was also a recruiter at INT. *Id.* He mentioned that he wanted these problems corrected because he and a lot of the other recruiters "were really feeling the burden." *Id.* at 96. Courtney recommended that Plaintiff call Mr. Knott directly and express his concerns, even offering to be on the call with him. *Id.* Plaintiff told her he would contact Mr. Knott by himself because he was "a big guy." *Id.* He testified that he called Mr. Knott later that afternoon. *Id.*

The next day, Mr. Knott called and spoke with Plaintiff for eleven minutes. Doc. 68-1 at 96; Doc. 73-3 at 20. Plaintiff testified that he specifically told Mr. Knott that he and other recruiters were having problems with Ms. Ellestad and Mr. Moloney. Doc. 68-1 at 97-98, 105. He also stated that "there's some sexual content on some of your calls that some people have complained about." *Id.* at 106. Before he finished saying "complained," Plaintiff asserts that Mr. Knott "took over the call" and "didn't allow [him] to speak." *Id.* Plaintiff testified that Mr. Knott said he didn't remember any conference calls involving the alleged sexual context (*id.* at 105) and deflected discussing Ms. Ellestad and Mr. Moloney by talking about how Plaintiff could do a "better job instead of worrying about the members of the organization that [he is] having problems with" (*id.* at 98). Plaintiff stated he "wasn't allowed to" raise specific examples

regarding Ms. Ellestad and Mr. Moloney because Mr. Knott would redirect the conversation when he attempted to raise a specific example. *Id*. at 98-99.

Mr. Knott denies this version of the phone conversation. *Id*. at 172. He testified that Plaintiff called him because he was financially stressed. *Id*. at 171, 173-175. In July and October 2015, Plaintiff took two salary advances totaling $3,500, and as of December 11, 2015, he had repaid $2,500 of the salary advances through $250 wage deductions per pay period. *Id*. at 150-151 ¶¶ 5-7. Mr. Knott averred that, on the call, he "sensed stress in [Plaintiff's] voice" and that he offered, in the Christmas spirit, to forgive the remaining $1,000 Plaintiff owed INT. *Id*. at 171, 173-175; Doc. 71-3 at 3. Mr. Knott also testified that Plaintiff "didn't seek forgiveness of the loan," but rather that he "offered [it] to him without him asking because he was so obviously stressed." Doc. 71-3 at 3. INT's Comptroller averred in a declaration that the remaining $1,000 was forgiven and not repaid by Plaintiff. Doc. 68-1 at 151 ¶ 8.

Plaintiff testified that in January 2016, during a work phone call with Ms. Ellestad, she described having sex with her husband on their honeymoon. *Id*. at 237; Doc. 71-1 at 19-21. Ms. Ellestad testified that she only discussed how her husband's legs got sunburned while fishing on their honeymoon. Doc. 73-4 at 13-14, 21-22.

Sometime in February 2016, Mr. Knott decided not to extend Plaintiff a draw, effective March 2016. Doc. 73-3 at 14-18. Under the terms of his offer of employment, Plaintiff received four draws in August, September, October, and November 2015, and INT decided to provide him a draw in December 2015, January 2016, and February 2016. *Id.* at 14-15. Based on both objective and subjective factors, however, Mr. Knott decided to discontinue Plaintiff's draw starting in March 2016. *Id.* at 17-18. Mr. Knott made this decision after consulting with his leadership team, including Ms. Ellestad. *Id.* at 18; Doc. 78-1 at 8-10. Ms. Ellestad testified that they decided to not to extend Plaintiff a draw based on his low productivity (Doc. 78-1 at 12) whereas Mr. Knott stated that Plaintiff's productivity was not "the sole reason" (Doc. 73-3 at 17). Ms. Ellestad informed Plaintiff about the discontinuation of his draw. Doc. 78-1 at 10, 12. Without a

draw, Plaintiff asserts he received $1,200 less a month.  Doc. 68-1 at 17; Doc. 73 at 6 ¶ 23; Doc. 78-1 at 11.[3]

In March 2016, Plaintiff attended a training session conducted by Ms. Ellestad in Charlotte, North Carolina.  Doc. 68-1 at 61, 237.  On the first day of the session, Ms. Ellestad came over to Plaintiff's table to show him how to perform some work-related function on his laptop.  *Id.* at 62, 65.  While doing so, Plaintiff testified that Ms. Ellestad leaned over and pressed her breast against his left arm.  *Id.* at 62-63.  He alleges that he then moved his left arm closer to his right arm to avoid having her touch him further.  *Id.* at 64, 237.  Plaintiff testified he moved his left arm away so that she would get "the point that she was violating [his] personal space."  *Id.* at 64.  Ms. Ellestad then allegedly proceeded to lean in closer as he pulled away so that her breast continued to touch his arm.  *Id.*  Plaintiff testified that incident was not "a quick brush," but lasted "long enough to make [him] very comfortable."  *Id.*  One employee, Ms. Noto, witnessed Ms. Ellestad leaning over and "rubbing up against [Plaintiff]," and Plaintiff moving his chair away at least twice in response.  Doc. 73-6 at 33-34.  The following day, Plaintiff told a fellow recruiter, Mr. Baker, about the incident.  Doc. 73-5 at 14.  Ms. Ellestad denies rubbing her breast on Plaintiff, testifying that it was physically impossible since she knelt down next to him.  Doc. 71-5 at 5-6.

Later, as Plaintiff prepared to leave that training session, Ms. Ellestad instructed him in a sexual tone to meet her in her hotel room the following day.  Doc. 71-1 at 38.  Plaintiff alleges she didn't make that statement to anyone else (*id.* at 39) and that other employees laughed when they heard the comment, understanding it to be sexually charged (*id.* at 38; Doc. 71-6 at 19; Doc. 73-2 at 4 ¶ 9).  He testified that other recruiters made "woo" and "ooh" grade schools sounds following Ms. Ellestad's remark.  Doc. 71-1 at 41.  Although Plaintiff and other recruiters attended a training session in Ms. Ellestad's hotel suite the following day (*id.* at 40; Doc. 78-1 at 18), he interpreted that

---

[3] There appears to be some discrepancy between this amount and the amount reflected in Plaintiff's offer letter, but the parties do not identify this as a significant factual issue.

statement as sexual in nature because of the earlier breast-rubbing incident (Doc. 71-1 at 38, 40-41). Ms. Ellestad, however, testified that she told all recruiters which hotel room to report to the following day and that no one laughed when she told Plaintiff to report to her hotel room. Doc. 78-1 at 18.

On March 10, 2016, Ms. Noto emailed Plaintiff about an incident at an INT work dinner on March 3 in Charlotte, North Carolina. Doc. 68-1 at 240. In her email, Ms. Noto stated that Mr. Moloney "pretended to undue [sic] his belt" in front of her and another co-worker while remarking, "I am going to show Katherine [Noto] how to keep her job." *Id.* She concluded by stating that she was "[i]ncredibly offended" and "upset" by Mr. Moloney's conduct. *Id.*

On March 14, 2016, Plaintiff alleges that Mr. Knott called him after work to discuss his performance. Doc. 68-1 at 238; Doc. 73-1 at 73-74. According to Plaintiff, Mr. Knott proceeded to tell him that he "had grown a reputation as being hard to work with among senior leadership" and that he was being placed on a performance plan despite having met his quarterly goals. Doc. 68-1 at 238; Doc. 73-1 at 73-74. When Plaintiff asked why he developed this reputation, Mr. Knott did not answer. Doc. 73-1 at 73-74. Plaintiff believes Mr. Knott took this course of action because he complained about INT's work environment. Doc. 68-1 at 238; Doc. 73-1 at 76.

On Mach 22, 2016, Plaintiff received an email from Ms. Ellestad stating, "Will you f'ing place this guy already." Doc. 68-1 at 241; Doc. 73-1 at 48. Plaintiff understood this to mean that he needed to place the job candidate, Dennis Chisholm, with a client. Doc. 73-1 at 49. He found the email "inappropriate and unprofessional," especially because it "was more of a compound" on prior incidents with Ms. Ellestad. *Id.*

Two days later, on March 24, 2016, the U.S. Equal Employment Opportunity Commission ("EEOC") received an intake questionnaire from Plaintiff alleging sex discrimination and retaliation by INT. Doc. 68-1 at 232-42. On April 4, 2016, Plaintiff filed a charge with the EEOC raising the same allegations. Doc. 18 at 2 ¶ 17. The next day, on April 5, 2016, Plaintiff completed an employee self-evaluation form for INT, in

which he stated that he was "discourage[d]" because he has been told that he has "gained a reputation of being hard to work with." Doc. 68-1 at 204. He also noted that there "needs to be better avenues" to raise issues about the company and that he felt "retaliate[ed]" against when his "draw was cut . . . after [he] tried to speak up about [his] concerns within the company." *Id.* After submitting this evaluation, Plaintiff testified that Ms. Ellestad negatively reviewed his work performance, stating that he had become hard to work with. Doc. 73-1 at 11, 79. Plaintiff complained to Ms. Rutledge about this comment, who deemed the comment "hearsay" and removed it from Plaintiff's review. *Id.* at 79-81.

On the evening of April 18, 2016, Ms. Moulton emailed Plaintiff, notifying him that she was "investigating the comments [he] made in [his] self-evaluation about retaliation" and requested to obtain his statement. Doc. 68-1 at 207. Ms. Moulton did not mention in her email that she was investigating Plaintiff's EEOC charge. *Id.* The following morning, on April 19, Plaintiff resigned via email from INT, stating that he has "been left no choice" due to "the continue[d] retaliation" and "sexual harassment" he experienced at INT. *Id.* at 209. He then replied to Ms. Moulton's earlier email, stating that he would speak with her about the internal investigation with his attorney present. *Id.* at 206. That same day he accepted a sales manager position at Group Management Services, another staffing firm, with an annual salary of $75,000 in addition to commissions. *Id.* at 213.

## II. Plaintiff's Failure to Comply with Local Rule 56.1.

INT's motion for summary judgment includes a separate statement of facts as required by Local Rule of Civil Procedure 56.1(a). Doc. 68. Plaintiff's response includes two corresponding statement of facts – a controverting statement of facts and a separate statement of additional facts in support of his response. Docs. 71, 73. By setting forth the disputed facts and additional facts in two statements of facts instead of one, Plaintiff violated Local Rule 56.1(b). Because his two separate statements totaled nineteen pages, Plaintiff also failed to comply with the Court's February 9, 2017 order, which requires

that Plaintiff's statement of fact "shall not exceed ten pages in length, exclusive of exhibits." Doc. 23.

INT moved to strike Plaintiff's additional statement of facts or alternatively to submit five more pages to address the additional facts asserted by Plaintiff. Doc. 74. On January 24, 2018, the Court decided not to strike Plaintiff's additional statement "[a]t this time," but granted INT's request to submit five more pages. Doc. 75. Local Rule of Civil Procedure 7.2(e)(2) sets an eleven-page limit for a reply, and so, the additional five pages gave INT sixteen pages for its reply. INT's filed a fourteen-page reply in support of its motion for summary judgment and addressed some of the additional facts. Doc. 76.

The extra pages appear to have afforded INT an adequate opportunity to address Plaintiff's additional facts. The Court will deny INT's motion to strike.

**III.    Legal Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**IV.    Discussion.**

Plaintiff alleges two Title VII claims: hostile work environment and retaliation. Doc. 18 at 9-10 ¶¶ 72-83. INT moves for summary judgment on both, and on Plaintiff's

claim for compensatory damages. Doc. 67. Plaintiff moves for partial summary judgment on INT's *Faragher/Ellerth* affirmative defense. Doc. 69.

### A. Hostile Work Environment.

To prevail on his hostile work environment claim, Plaintiff must show that (1) he was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) (en banc) (quoting *Ellison v. Brady*, 924 F.2d 872, 875-76 (9th Cir. 1991)). The work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the [plaintiff] in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

INT argues that Plaintiff's hostile work environment claim fails because the alleged conduct was neither unwelcome nor sufficiently severe and pervasive to be actionable under Title VII.[4]  Doc. 67 at 7-11; Doc. 76 at 3-9. The Court finds that disputes of material fact prevent the entry of summary judgment on this claim.

### 1. Unwelcome Conduct.

INT contends that it "is simply not credible" that Plaintiff was the victim of unwelcome sexual conduct because he "*actively* engaged in sexual comments and jokes himself." Doc. 67 at 9, 11 (emphasis in original). INT relies on a Seventh Circuit case, *Reed v. Shepard*, 939 F.2d 484, 491-92 (7th Cir. 1991), for the proposition that a

---

[4] INT also states that Plaintiff's sexual harassment claim fails because "some of the alleged offensive conduct does not involve verbal or physical conduct of a sexual nature." Doc. 67 at 6. Other than this one cursory sentence, INT does not further develop this argument or identify which alleged conduct was not sexual in nature. INT has not shown that the alleged conduct is not of a sexual nature. *Celotex Corp.*, 477 U.S. at 323. The alleged conduct of which Plaintiff complains – the breast rubbing incident, the hotel comment, the icebreaker game, the midget sex comment, and the gay oral sex comment – are clearly of a sexual nature.

plaintiff's "enthusiastic receptiveness to sexually suggestive jokes and activities" indicates that the conduct was not unwelcome. *Id.*

INT cites no Ninth Circuit opinion adopting *Reed*'s "enthusiastic receptiveness" standard. *See* Doc. 67 at 9-11; Doc. 76 at 8-9. The relevant Ninth Circuit standard is whether Plaintiff, by his conduct, indicated that the alleged harassment was unwelcome. *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 873 (9th Cir. 2001). The Ninth Circuit has found conduct to be unwelcome if the plaintiff complained about it. *Id.* Moreover, the Supreme Court has noted that "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).

The Court finds disputes of material fact as to whether the alleged conduct was unwelcome. First, the parties dispute whether Plaintiff welcomed the conduct through his participation. INT presents evidence that Plaintiff participated in some inappropriate sexual communications. Although most of the inappropriate sexual communication is between Plaintiff and his fellow coworkers (Doc. 68-1 at 246, 257, 259, 261, 272, 279), Plaintiff also engaged in such banter with his alleged harassers, Ms. Ellestad and Mr. Mr. Moloney (*id.* at 267, 269, 283, 286-87). But Plaintiff testified that he engaged in this inappropriate sexual banter with INT's leadership team – most of which occurred during the first few months after he started working at INT – in order to "fit in" and be part of the "good ol' boys club." Doc. 71-1 at 51. *Cf. Sarantis v. ADP, Inc.*, No. CV-06-2153-DGC, 2008 WL 1776508, *13 (D. Ariz. Apr. 18, 2008) (denying summary judgment on whether plaintiff welcomed alleged conduct where plaintiff "played along with . . . a powerful and influential" supervisor's advances).

The parties also dispute whether Plaintiff welcomed Ms. Ellestad rubbing her breast on his arm during a computer training session. Plaintiff testified that he moved his arm away so that Ms. Ellestad would get "the point that she was violating [his] personal space." Doc. 68-1 at 64. Another employee testified she witnessed Ms. Ellestad rubbing

up against Plaintiff and that he moved his chair away at least twice in response. Doc. 73-6 at 33-34. Plaintiff's alleged physical reactions reflect that Ms. Ellestad's physical contact was unwelcome. Ms. Ellestad, on the other hand, contends it was physically impossible for her to press her breast against Plaintiff's arm because she knelt down next to him, as opposed to leaning over him.[5] Doc. 71-5 at 5.

Lastly, there is a dispute of material fact as to whether Plaintiff complained to INT about the discriminatory conduct. Plaintiff presents evidence that he complained in December 2015 to Mr. Knott. He testified that he specifically mentioned he had problems with Ms. Ellestad, Mr. Moloney, and the "sexual content" on the INT conference calls. INT counters with evidence that Plaintiff did not complain in December 2015. Mr. Knott testified he only spoke about Plaintiff's financial problems.

These disputes of material fact prevent the entry of summary judgment on whether the alleged conduct was unwelcome.

## 2. Severe or Pervasive.

When assessing severity and pervasiveness, courts look at all the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787-88 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Nichols*, 256 F.3d at 872 (internal quotation marks omitted). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotation marks omitted).

---

[5] INT argues that it is "especially perplexing" that Plaintiff was offended by this alleged breast rubbing incident because he had "visited strip clubs on numerous occasions and received lap dances that involved women rubbing their nude breasts against him." Doc. 67 at 8 n.2. But "[a] person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment at work." *Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi.*, 488 F.3d 739, 746 (7th Cir. 2007) (citation and quotation marks omitted).

INT argues that Plaintiff was not subjected to severe or pervasive conduct because his "primary allegation involves a *one-time* incident" in which his supervisor, Ms. Ellestad, allegedly rubbed her breast against Plaintiff during a training session. Doc. 67 at 7 (emphasis in original). The Ninth Circuit has held that a single incident of sexual harassment "may well be sufficiently severe so as to alter the conditions of employment and give rise to a hostile work environment claim." *Brooks v. City of San Mateo*, 229 F.3d 917, 927 n.9 (9th Cir. 2000); *see also Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967-68 (9th Cir. 2002). For a single incident to ever suffice, it must be "extremely severe." *Brooks*, 229 F.3d at 926. The Court need not decide whether the alleged incident alone is extremely severe because it is not "an entirely isolated incident." *Id.* at 927.

Plaintiff alleges sexual harassment by members of INT's leadership team, which includes Mr. Moloney, Mr. Knott, and Plaintiff's immediate supervisor, Ms. Ellestad. The Court must consider the alleged actions of all of these individuals. *See Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 421 (9th Cir. 2013) (considering the conduct of both the harassing coworker and immediate supervisor when assessing whether plaintiff was subjected to severe or pervasive harassment). The fact that Plaintiff's immediate supervisor and other INT officials engaged in the alleged conduct can render the actions more "emotionally and psychologically threatening" than had they been committed by his coworkers. *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1056 (9th Cir. 2007). And how INT's leadership team reacted to the harassing behavior they allegedly witnessed Plaintiff suffer informs this analysis. *See Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000) (discussing *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504, 1515 (9th Cir. 1989), where the Ninth Circuit affirmed the district court's finding that sexual harassment was sufficiently "severe or pervasive" because plaintiff's direct supervisor "frequently witnessed, laughed at, and herself made these types of comments").

Plaintiff's evidence, if accepted as true by the jury, shows the following: At Plaintiff's first training session, Mr. Moloney, Ms. Ellestad, and Mr. Knott laughed at the "sex in a convent" comment. At dinner that night, Mr. Moloney and Ms. Ellestad engaged in offensive and sexually explicit banter. On weekly phone conferences, sexually explicit jokes and comments by INT supervisors were commonplace. Plaintiff provides specific examples and notes that Mr. Knott was present on the calls and participated in the banter. On a separate call, Ms. Ellestad described having sex with her husband, Mr. Moloney. In an email exchange, Mr. Knott, Ms. Ellestad, and Mr. Moloney made sexual jokes involving a veteran. At a second training session, Ms. Ellestad rubbed her breast on Plaintiff and later made a sexual innuendo about Plaintiff reporting to her hotel room. Around the same time, Plaintiff received an email from a fellow employee in which she described how Mr. Moloney pretended to unzip his pants while saying he was going to teach her how to keep her job.

This series of incidents could readily be found by a jury to constitute severe or pervasive harassment. Plaintiff admitted that some of the early communications were not necessarily offensive (Doc. 71-1 at 30), but that the "compounding effect" of all this behavior made it offensive (*id.* at 20, 50). He stated that the breast rubbing incident, followed by the hotel room comment, was "the straw that broke the camel's back." *Id.* at 10. The fact that INT's leadership team frequently witnessed, laughed at, and made these remarks, even in the presence of Mr. Knott, suggests that INT condones such behavior. *See Brooks,* 229 F.3d at 924 n.4 ("A case involving a single incident of sexual harassment is obviously distinct from one involving a series of incidents, which the employer knows about and does nothing to correct. In such circumstances, the non-action by the employer can fairly be characterized as acquiescence, i.e., having changed the terms and conditions of employment to include putting up with harassment from other employees."). And the fact that Plaintiff knew and witnessed discriminatory conduct directed at other employees informs the Court's assessment of the pervasiveness of the harassing conduct at INT. *See Dominguez-Curry v. Nev. Transp. Dep't.*, 424

F.3d 1027, 1036-37 (9th Cir. 2005) (reversing grant of summary on plaintiff's sexual harassment claim because the district court "erroneously disregarded evidence of discriminatory comments that [a supervisor] directed to other women in the division"). Thus, although each incident "standing alone might not satisfy the standard," they are sufficient "in the aggregate" to raise material issues of fact as to whether the conduct was severe or pervasive enough to alter the conditions of Plaintiff's employment. *Craig*, 496 F.3d at 1057; *see also Zetwick v. Yolo*, 850 F.3d 436, 444 (9th Cir. 2017) (requiring courts to consider "the cumulative effect of the conduct at issue to determine whether it was sufficiently 'severe or pervasive' to alter the conditions of the workplace").

INT argues that the hostile work environment claim fails because Plaintiff worked remotely and had only two physical interactions with Ms. Ellestad during his time at INT. Doc. 67 at 8. In support, INT points to *Westendorf*, 712 F.3d at 419-20, where the Ninth Circuit affirmed the dismissal of the plaintiff's hostile work environment claim in part because the plaintiff there had limited contact (i.e., once a week for three months) with her harassing coworker and supervisor. But this argument inappropriately minimizes the Court's obligation to look at "all of the circumstances" when assessing the severity or pervasiveness of the alleged harassment. This is especially true here, where Plaintiff presents evidence that a principal means of communication with INT's leadership team – namely, phone call and emails – was littered with sexual language and innuendos. *See Dominguez-Curry*, 424 F.3d at 1035 (reversing grant of summary judgment because the district court erroneously disregarded the evidence about the frequency of the supervisor's discriminatory remarks, which plaintiff testified occurred "like everyday").

The Court concludes that disputes of material fact prevent the entry of summary judgment on whether the alleged conduct was severe or pervasive.

## B.    Retaliation.

Title VII prohibits retaliation against an employee for opposing an unlawful employment practice or participating in a Title VII proceeding. 42 U.S.C. § 2000e-3(a). A successful retaliation claim must establish that (1) the employee engaged in a protected

activity, (2) the employer took an adverse employment action against the employee, and (3) the employer would not have taken the adverse employment action but for a design to retaliate. *Nilsson v. City of Mesa*, 503 F.3d 947, 953-54 (9th Cir. 2007); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (clarifying that employee must show "but for" causation).

INT argues that Plaintiff did not engage in a protected activity and that it did not take any adverse employment action against Plaintiff. Doc. 67 at 11-15. Disputes of material fact prevent the entry of summary judgment on this claim.

### 1. Protected Activity.

An employee engages in "protected activity" when he complains about or protests conduct that he reasonably believes constitutes an unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a) (describing "protected activity"); *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). INT contends that Plaintiff never engaged in such activity. Doc. 67 at 12-13. Specifically, INT argues that Plaintiff's phone calls with Courtney and Chris Knott in December 2015 do not constitute complaints because he did not provide any specific examples of the sexual harassment. *Id.* Moreover, INT argues that it could not have retaliated against Plaintiff based on his EEOC charge because INT received notice of the charge after the alleged retaliatory conduct occurred. *Id.* at 13.

"An employee need not utter magic words to put his employer on notice that he is complaining about unlawful discrimination." *Ekweani v. Ameriprise Fin., Inc.*, No. CV-08-01101-PHX-FJM, 2010 WL 481647, at *6 (D. Ariz. Feb. 8, 2010) (citation omitted). Whether "analyzed as a requirement for protected activity or under the element of causal link, [] an employer must reasonably be aware that its employee is engaging in protected activity." *Id.* (citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.")); *see also Quinones v. Potter*, 661 F. Supp. 2d 1105, 1126-27 (D. Ariz. 2009) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 291-92 (2d Cir. 1998) for the proposition that "implicit in the

requirement that the employer have been aware of the protected activity is the requirement that it understood or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII").

The parties dispute whether Plaintiff complained to INT in December 2015. Plaintiff testified that he spoke with Courtney Knott, the daughter of Chris Knott and INT manager, on December 16, 2015. Although only providing "very generic examples" of his problems, he specifically asked her how to raise his concerns about Ms. Ellestad and Mr. Moloney to her father. Pursuant to her advice, Plaintiff spoke with Chris Knott the following day. On that call, Plaintiff testified that he told Mr. Knott that he and other employees were having problems with Ms. Ellestad, Mr. Moloney, and the "sexual context on some of [the] calls." He stated that Mr. Knott would not "allow [him] to speak" or to provide specific examples but just admonished Plaintiff to focus on how he could do a "better job instead of worrying about the members of the organization that [he is] having problems with." Mr. Knott denied this occurred, testifying that they discussed Plaintiff's financial stress. INT also produces documentation indicating that it forgave Plaintiff's remaining debt, which Mr. Knott testified he offered to do for Plaintiff during the call.

The parties do not dispute that these phone calls occurred; rather, they dispute their content. Although the December 16 call with Courtney Knott may be too vague to provide sufficient notice to INT of discriminatory conduct, a reasonable jury could find that the December 17 call put Mr. Knott on notice that Plaintiff was complaining about sexual harassment. The Court accordingly concludes that disputes of material fact prevent the entry of summary judgment on whether Plaintiff engaged in protected activity.[6]

---

[6] Because the alleged retaliatory conduct occurred after the December 2015 phone calls, the Court need not address whether INT was aware of the EEOC charge when it engaged in the alleged retaliatory conduct.

### 2. Adverse Employment Action.

Title VII's anti-retaliation provision protects against "materially adverse" employment actions – actions that might dissuade a reasonable worker from making or supporting a charge of discrimination – but not against "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Court's role at the summary judgment stage is limited to determining whether there is evidence in the record that would support a reasonable jury in finding that the action complained of was materially adverse. Where the evidence would permit no such finding, the Court may grant summary judgment. *See, e.g., Johnson v. Fed. Express Corp.*, No. CV-14-02428-PHX-DGC, 2016 WL 1593811, at *4 (D. Ariz. Apr. 21, 2016).

INT argues that there is no evidence that it took any adverse employment action against Plaintiff. Doc. 67 at 13-15. Plaintiff identifies at least four instances of adverse action: (1) Mr. Knott cut Plaintiff's draw in close proximity to the December 2015 phone calls; (2) INT started giving him lower quality leads, which affected his ability to perform and earn commissions; (3) Ms. Ellestad gave him a negative performance review, which Plaintiff acknowledges INT later reversed after he complained; and (4) Mr. Knott informed Plaintiff that he was developing a reputation as being hard to work with among INT's leadership team. Doc. 72 at 16-17.

A negative performance review, which is subsequently reversed or changed by the employer, and "badmouthing an employee outside the job reference context do not constitute adverse employment actions." *Brooks*, 229 F.3d at 929-930; *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1112-1113 (9th Cir. 2000) (holding that a subsequently corrected evaluation does not constitute an adverse employment action). Consequently, Plaintiff's concerns about his reversed performance review and the "hard to work with" reputation do not suffice.

The parties dispute whether Mr. Knott's decision to not extend Plaintiff's draw constitutes an adverse employment action. Although his offer of employment letter only

guaranteed Plaintiff a draw for four months with the possibility of a two month extension for good performance, INT concedes it gave Plaintiff a draw for seven months – one month beyond what it contractually offered. The record also includes evidence that other employees received draws beyond what they were contractually entitled to receive. Doc. 73-1 at 78, 80; Doc. 73-2 at 4 ¶ 11; Doc. 73-3 at 15, 17, 21; Doc. 71-6 at 4, 5. The lack of a draw reduced Plaintiff's earnings by $1,200 per month. The Ninth Circuit has held that decreased compensation can be an adverse employment action, including situations when the compensation is not guaranteed contractually. *See Little*, 301 F.3d at 970 (reduction in monthly pay is an adverse employment action); *Ray*, 217 F.3d at 1241 (discussing *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996), where the Ninth Circuit found a plaintiff suffered an adverse employment action because "she was excluded from meetings, seminars, and positions *that would have made her eligible* for salary increases" (emphasis added)). And providing Plaintiff lower quality leads could be materially adverse because it could affect his compensation, which is based in part on commission.

A reasonable jury could find that a $1,200 reduction in monthly pay and poorer leads could dissuade a reasonable worker from making or supporting a charge of discrimination.

### C. Damages.

INT argues that it is entitled to summary judgment on compensatory damages because Plaintiff failed to produce sufficient evidence, such as tax returns or names of medical providers, showing that he suffered economic and emotional damages. Doc. 67 at 15-16; Doc. 76 at 12. In his complaint, Plaintiff seeks "back pay, front pay, and any other available compensatory damages" as well as "general damages for his emotional distress, sleeplessness, depression, loss of focus and concentration, pain and suffering, inconvenience, mental anguish, embarrassment, frustration, humiliation, and the loss of enjoyment of life." Doc. 18 at 10 ¶¶ A-B.

- 20 -

Plaintiff has presented evidence to substantiate his alleged damages. Plaintiff testified that he lost wages as result of quitting INT because INT recruiters he started with make more money than he currently makes. Doc. 71-1 at 97. He worked from home while at INT, and Plaintiff testified that he must commute an hour each way to his new job. Doc. 71-1 at 98-99. Plaintiff also asserts that he must pay for after-school daycare for two of his three children because he no longer works from home. Doc. 71-1 at 99. And he testified that he sought medical treatment for stress and a panic attack due to the harassment at INT. Doc. 71-1 at 102-108. From this evidence, a reasonable jury could find that Plaintiff has suffered damages.

### D. Faragher/Ellerth Affirmative Defense.

"Under Title VII, there is a presumption that an employer is vicariously liable for a hostile environment created by a supervisor." *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1074 n.2 (9th Cir. 2005) (internal quotation marks and citation omitted). An employer may avoid liability if it shows by a preponderance of evidence that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer[.]" *Faragher*, 524 U.S. at 807; *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998) (collectively, *Faragher/Ellerth* defense). But an employer cannot assert a reasonable care defense if (1) the "employee has been subjected to an unlawful 'tangible employment action' by a supervisor," *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1167 (9th Cir. 2003), or (2) "the corporate officers who engage[d] in illegal conduct are sufficiently senior to be considered proxies for the company," *Passantino v. Johnson & Johnson Consumer Prod., Inc.*, 212 F.3d 493, 517 (9th Cir. 2000).

Plaintiff argues that the *Faragher/Ellerth* defense is unavailable because Ms. Ellestad was a proxy of INT and took a tangible employment action against him. Doc. 69 at 5-8. Even if INT can assert the defense, Plaintiff contends that it cannot demonstrate

reasonable care.  *Id.* at 8-11.  Genuine issues of material fact prevent summary judgment on this issue.

### 1.    Tangible Employment Action.

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.  Such actions "are the means by which the supervisor brings the official power of the enterprise to bear on subordinates," and it "requires an official act of the enterprise, a company act." *Id.* at 762.  "A tangible employment action in most cases inflicts direct economic harm." *Id.*  But "even if a tangible employment action occurred, an employer may still assert the affirmative defense if the tangible employment action 'was unrelated to any harassment or complaint thereof.'" *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th Cir. 2004) (citing *Nichols*, 256 F.3d at 877).

The parties dispute whether Mr. Knott's decision to not extend Plaintiff a draw constitutes a tangible employment action.  Doc. 69 at 6-8; Doc. 77 at 5-7.  Although Plaintiff may not have been contractually guaranteed a draw for more than six months, INT gave Plaintiff a draw for one month beyond what his offer letter provided.  And, as noted above, the fact that a draw is not contractually guaranteed does not necessarily mean that it is not a benefit of employment.  Evidence in the record shows that Mr. Knott, Ms. Ellestad, and other members of INT's leadership team met, discussed, and decided not to extend Plaintiff a draw, and this decision to discontinue Plaintiff's draw inflicted direct economic harm on Plaintiff.  Plaintiff has presented evidence sufficient for a reasonable jury to find that this decision was a tangible employment action.

But even if the decision to discontinue Plaintiff's draw was a tangible employment action, the parties dispute the motivation for that decision.  Given the temporal proximity between Plaintiff's December 2015 complaint and the draw decision, Plaintiff contends that INT declined to extend the draw because he complained of sexual harassment.  Although Mr. Knott admits Plaintiff's productivity was not the "sole reason" (Doc. 73-3

at 17), Mr. Knott and Ms. Ellestad testify that they eliminated the draw because of Plaintiff's low productivity. This conflicting testimony creates a dispute of material fact as to the motivation of INT's decision. *See Elvig*, 375 F.3d at 959 ("[E]ven if a tangible employment action occurred, an employer may still assert the affirmative defense if the tangible employment action 'was unrelated to any harassment or complaint thereof.'" (citing *Nichols*, 256 F.3d at 877)).[7]

## 2. Proxy Doctrine.

Plaintiff argues that INT cannot assert the *Faragher/Ellerth* defense because Ms. Ellestad was a high-ranking officer and a proxy for INT. Doc. 69 at 5-6. The Ninth Circuit has recognized that an employer cannot invoke the *Faragher/Ellerth* defense if the harasser is "sufficiently senior" to be considered a proxy for the company. *See Passantino*, 212 F.3d at 517; *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1197-98 (9th Cir. 2002).[8] The Supreme Court has held that the individual who holds the highest position within the organization is "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy," *Faragher*, 524 U.S. at 789, and has further suggested that an owner, supervisor holding a "sufficiently high position 'in the management hierarchy,'" proprietor, partner, or

---

[7] Plaintiff argues that he suffered other tangible employment actions, such as being given lower quality leads and being labeled "hard to work with" by the leadership team. Doc. 69 at 7-8. Even assuming these constitute tangible employment actions, the question remains whether they are unrelated to the alleged sexual harassment complaint.

[8] *Passantino* and *Hemmings* both concern whether the proxy doctrine prohibits an employer from raising the *Faragher/Ellerth* defense to an award of punitive damages. *See Passantino*, 212 F.3d at 517; *Hemmings*, 285 F.3d at 1197-98. Outside of the punitive damages context, neither opinion expressly holds that the *Faragher/Ellerth* defense is unavailable when the alleged harasser is a proxy for the employer. Plaintiff cites non-binding decisions reaching that conclusion, *see, e.g., Johnson v. West*, 218 F.3d 725 (7th Cir. 2000), and the Court finds no Ninth Circuit case adopting such a rule. Some district courts in the Ninth Circuit have reached such a holding. *See, e.g., E.E.O.C. v. OSI Rest. Partners, Inc.*, No. CV-07-0683-PHX-SMM, 2010 WL 11519281, at *11 (D. Ariz. Feb. 5, 2010); *E.E.O.C. v. Reeves*, No. CV0010515DTRZX, 2003 WL 22999369, at *9 (C.D. Cal. Dec. 8, 2003). Neither party raises this issue, and the Court therefore will assume without deciding that the proxy doctrine can bar the *Faragher/Ellerth* defense.

corporate officer may also be treated as a corporation's proxy, *see id.* at 789-90. Other than these parameters, "the Supreme Court and the Ninth Circuit have not set forth determinative factors for when an individual is 'sufficiently senior' or 'sufficiently high up' in a company." *E.E.O.C. v. OSI Rest. Partners, Inc.*, No. CV-07-0683-PHX-SMM, 2010 WL 11519281, at *11 (D. Ariz. Feb. 5, 2010).

The parties dispute whether Ms. Ellestad is "sufficiently senior" to be treated as a proxy for the company. Doc. 69 at 5-6; Doc. 77 at 3-4. Ms. Ellestad is INT's Vice President of Recruiting and one of six individuals on INT's leadership team that advises Mr. Knott on business matters. It is unclear what authority she possesses as a member of INT's leadership team. Ms. Ellestad testified that she could not discontinue a recruiter's draw without Mr. Knott's approval (Doc. 80-2 at 4), but she also stated that Mr. Knott could not make this decision alone because such decisions require the approval of "two or more" members of INT's leadership team (*id.* at 4). She also testified that she is not aware of Mr. Knott discontinuing an employee's draw on his own. *Id.* at 5. During his deposition, Mr. Knott at times testified that draw discontinuation decisions are "made by the leadership team" (Doc. 73-3 at 10); that it "depends on the situation" as to who "makes the final decisions at INT" (Doc. 78-4 at 6); and used the pronoun "we" when asked how many times he extended Plaintiff's draw (Doc. 73-3 at 15). At other times, Mr. Knott testified that, although he discusses with his leadership team whether to continue an employee's draw, he is "ultimately responsible for that decision" (*id.* at 18) and has "veto power" (Doc. 78-4 at 127).

It also is unclear who supervises and disciplines Ms. Ellestad. Plaintiff contends that Ms. Ellestad reports to Mr. Knott. Doc. 80 at 1 ¶ 19. Mr. Knott testified that Ms. Ellestad reports to him "for the most part" as well as to Ms. Rutledge, Vice President and Director of Technical Recruiting. Doc. 80-1 at 4. But he also admitted that only he evaluates Ms. Ellestad's job performance and decides her salary and bonus percentage. *Id.* at 4, 8-9. Ms. Moulton, INT's Human Resource Manager, serves on INT's leadership team and averred in a declaration that she has "the power to take disciplinary action

against [Ms. Ellestad]" if she "violate[s] INT's anti-harassment policy."[9]  Doc. 78-5 at 3 ¶ 7.  Ms. Moulton reports to Mr. Knott (Doc. 78-4 at 4), but Mr. Knott testified that Ms. Moulton "maintains autonomy" as to how to handle and resolve sexual harassment complaints (*id.* at 3-4).  He stated that Ms. Moulton serves as a "confidential source" for complaints and does not necessarily have to report harassment complaints to him.  *Id.* at 3-4.  But because Mr. Knott reviews Ms. Ellestad's job performance and decides her pay and benefits, it is unclear how Ms. Moulton can discipline Ms. Ellestad, especially since Ms. Moulton is not necessarily required to notify Mr. Knott of sexual harassment complaints regarding Ms. Ellestad.

In light of this lack of clarity as to Ms. Ellestad's authority and relationship with other corporate officers, disputes of material fact prevent the entry of summary judgment on this issue.

### 3. Reasonable Care.

In order to succeed on the *Faragher/Ellerth* affirmative defense, an employer must show by the preponderance of the evidence that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.  Plaintiff argues that the undisputed facts show that INT cannot establish either element.  Doc. 69 at 8-11.

With respect to the first element, "an employer's adoption of an anti-harassment policy and its efforts to disseminate the policy to its employees establish that [the employer] exercised reasonable care to prevent sexual harassment in the workplace."  *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1185 (9th Cir. 2005) (citation and quotation

---

[9] Plaintiff argues in its reply that Ms. Moulton's declaration is a sham declaration because it was prepared solely to contradict Ms. Ellestad's prior deposition testimony.  Doc. 79 at 9.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (citation and quotation marks omitted).  Plaintiff's argument fails because Ms. Moulton is not contradicting her prior deposition, but the deposition testimony of another individual.

marks omitted). INT produces their "Policies and Procedures Manual," which includes its anti-harassment policy. Doc. 68-1 at 13-15. The policy describes prohibited sexual conduct, the complaint and investigation procedures, and the enforcement of the policy. *Id.* at 14-15. The policy does not require Plaintiff to report harassment to his immediate supervisor, Ms. Ellestad, but rather affords him two reporting avenues: either the Director of Human Resources or his Account Manager.[10] *Id.* at 15. INT also produces an "Associate Handbook Acknowledgement Form," which states that the handbook "contains important information and guidelines such as prohibited harassment and Equal Employment Opportunity." Doc. 78-8 at 2. Plaintiff signed the form on July 13, 2015, acknowledging that he "received this Handbook and understand[s] that it is [his] responsibility to read and comply with the policies contained [therein]." *Id.* Plaintiff testified that he was familiar with INT's anti-harassment policy (Doc. 78-2 at 6), and he does not dispute that he received "the Manual" (Doc. 80 at 7 ¶ 37).[11]

INT must also demonstrate that it took reasonable steps to promptly resolve Plaintiff's sexual harassment complaint. *Hardage*, 427 F.3d at 1185-86. Although an "investigation is a key step," courts must "'consider the overall picture' to determine whether the employer's response was appropriate." *Id.* at 1186 (quoting *Swenson v. Potter*, 271 F.3d 1184, 1193, 1197 (9th Cir. 2001)). "Notice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is 'reasonably

---

[10] Plaintiff argues for the first time in his reply that the anti-harassment policy is unreasonable because there is no "Director of Human Resources." Doc. 79 at 8. The Court will not consider an argument made for the first time in a reply. *Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007).

[11] INT notes that it required all employees to attend formal anti-harassment training in July 2016 and January 2018. Doc. 77 at 8; Doc. 78-5 at 4 ¶ 14. But it is undisputed that Plaintiff quit in April 2016, and therefore could not have attended these training sessions. INT does not state that Plaintiff attended any anti-harassment training sessions. Even so, INT's adoption and communication of an anti-harassment policy, which Plaintiff does not dispute, establishes reasonable care to prevent harassment as a matter of law. *See Hardage*, 427 F.3d at 1185 (finding employer fulfilled its preventive measures "to disseminate the policy" because the parties did not contest that the employer had an anti-harassment policy, with which the employee was familiar).

calculated to the end the harassment.'" *Swenson*, 271 F.3d at 1192 (quoting *Nichols*, 256 F.3d at 875).

Plaintiff argues that INT did not promptly address the harassing behavior because INT did not investigate his December 2015 complaint to Mr. Knott. Doc. 69 at 9. INT counters with evidence that the December 2015 telephone conversation was not a complaint and that it first learned of Plaintiff's EEOC charge in April 2016, whereupon it promptly opened an investigation. This dispute precludes summary judgment based on INT's alleged failure to take prompt corrective action.[12]

With respect to the second element of the defense, Plaintiff must have "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or *to avoid harm otherwise*." *Faragher*, 524 U.S. at 807 (emphasis added). "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* at 807-08; *Ellerth*, 524 U.S. at 765.

The parties do not dispute that Plaintiff never complained to his Account Manager or the Human Resource Manager, as required by INT's anti-harassment policy. They instead dispute the reasonableness of Plaintiff's decision to not follow INT's complaint procedure. On one hand, it may have been reasonable for Plaintiff to not complain to his Account Manager because his Account Manager reports to Ms. Ellestad's husband, Mr. Moloney. *See* Doc. 78-7 at 2. It may also have been reasonable for Plaintiff to not complain to Ms. Moulton because she did not necessarily have to report his complaint to Mr. Knott and she may not have had the power to discipline Ms. Ellestad. But as noted above, the parties dispute Ms. Moulton's disciplinary power over Ms. Ellestad. Even assuming that Plaintiff may have acted unreasonably by not complaining to Ms. Moulton,

---

[12] Plaintiff argues for the first time in his reply that INT did not promptly investigate his EEOC charge or his claim of retaliation set forth in his self-evaluation. Doc. 79 at 9. The Court cannot consider this argument. *Gadda*, 511 F.3d at 937 n.2.

his alleged complaint in December 2015 to Mr. Knott would suffice as an attempt "to avoid harm otherwise" because Mr. Knott, as Ms. Ellestad's supervisor, could have put a stop to the harassment. *Cf. Holly D.*, 339 F.3d at 1179 (finding the failure to use the company's reporting procedures to be unreasonable because plaintiff "made no attempt to seek relief from any person able to help put a stop to the harassment"); *Jernigan v. Alderwoods Grp., Inc.*, 489 F. Supp. 2d 1180, 1197 (D. Or. 2007) (finding that employer cannot show as a matter of law that plaintiff unreasonably failed to invoke the complaint procedure and avoid harm because plaintiff complained to her supervisor for two years before reporting the sexual harassment to human resources, as required by the company's complaint procedures). Because the parties dispute whether Plaintiff attempted to avoid harm by reporting his harassment to Mr. Knott and whether Ms. Moulton has the power to discipline Ms. Ellestad, a jury must decide whether Plaintiff acted unreasonably by failing to use INT's complaint procedure.

Because genuine issues of material fact exist as to both elements of INT's *Faragher/Ellerth* affirmative defense, the Court will deny Plaintiff's motion for partial summary judgment.

**IT IS ORDERED:**

1.      INT's motion for summary judgment (Doc. 67) is **denied**.

2.      Plaintiff's motion for partial summary judgment (Doc. 69) is **denied**.

3.      INT's motion to strike (Doc. 74) is **denied**.

4.      The Court will hold a conference call on **May 30, 2018 at 4:30 p.m.** to set a final pretrial conference and trial date. Counsel for Plaintiff shall initiate a conference call to include all counsel and the Court. If a dial-in number is to be used, the dial-in information shall be provided to all counsel and the Court no later than May 29, 2018 at 12:00 noon.

Dated this 21st day of May, 2018.

David G. Campbell

_____

David G. Campbell
United States District Judge